Pages 1 - 29

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | | |
|---|---|---|
| CHRISTOPHER WAGNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. C 13-4952 WHA |
| | ) | |
| DIGITAL PUBLISHING CORPORATION, | ) | |
| et al, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Thursday |
| | ) | February 26, 2014 |
| _____ | ) | 8:00 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**            THE LAW OFFICES OF DANIEL BALSAM
                             2601C Blanding Avenue
                             No. 271
                             Alameda, California 94501
                        **BY:  DANIEL BALSAM, ESQ.**


**For Defendant:**           NEWMAN DU WORS, LLP
                             1900 Powell Street
                             Suite 603
                             Emeryville, California 94608
                        **BY:  LEEOR NETA, ESQ.**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

```
 1                       P R O C E E D I N G S
 2   February 26, 2015                                    8:41 a.m.
 3           THE COURT:  Now we go to -- let's see which case
 4   we're going to.  We're going to go to Wagner versus many
 5   defendants.
 6           MR. BALSAM:  Good morning, your Honor.
 7           THE COURT:  Good morning.
 8           MR. BALSAM:  Dan Balsam representing Christopher
 9   Wagner.
10           THE COURT:  Who?
11           MR. BALSAM:  Dan Balsam representing Christopher
12   Wagner.
13           THE COURT:  You're the plaintiff and you're the
14   defendant.
15           MR. NETA:  That's correct, your Honor.
16           THE COURT:  Defendants, many of them.
17           MR. NETA:  Yes.
18           THE COURT:  All right.  What would you like to stay.
19           THE REPORTER:  Counsel, could you state your name,
20   please?
21           MR. NETA:  Of course.  Thank you.  Leeor Neta for the
22   defendants.
23           THE COURT:  All right.  It's your motion.  You get to
24   go first.
25           MR. NETA:  Thank you, your Honor.
```

1      So I'd like to talk briefly about the fact that there are

2   no violations for any of these emails.

3      In California if an email is traceable to the sender

4   advertiser and there -- either because of a record for domain

5   name or because there are sufficient identifiers within the

6   email, then it doesn't constitute a violation of the Cal spam

7   law.

8      And what the California state courts have said is that if

9   there is a hyperlink to the sender's website in the email, an

10  unsubscribe notice and a physical address for the sender, there

11  is no violation.

12     Here we have emails that have hyperlinks the advertiser's

13  website, multiple undersubscribe links and a common display of

14  sender address.

15         THE COURT:  Let me ask the question I asked other

16  lawyers.  What you're relying on is an intermediate Court of

17  Appeals decision.

18         MR. NETA:  I'm prepared to speak to that issue, your

19  Honor.

20         THE COURT:  Good.  I'd like to hear the answer.  What

21  do you say the answer is to that?

22         MR. NETA:  There is an on point Ninth Circuit

23  decision called *Cal Pro-Life Council, Inc. versus Getman* --

24         THE COURT:  What's the name of it again?

25         MR. NETA:  *Cal Pro-Life Council, Inc. versus Getman*,

1    and it's cited at 328 F.3d 1088, Page 1099.  It's a Ninth

2    Circuit decision from 2003.  In it it says:

3         "Federal Courts must follow state's intermediate

4         Appellate Courts absent convincing evidence that the

5         state's highest court would rule differently."

6         **THE COURT:**  See, that's what I thought the rule was,

7    but I couldn't get my law clerks to find that.

8         Where did you find that?

9         **MR. NETA:**  I don't want to embarrass anybody.  I

10   found it quickly on a website after you mentioned it during the

11   last proceeding.

12        There is also a Supreme Court case, which I don't have

13   right here in front of me, *Johnson*, which also indicates that

14   Courts are abound to follow the highest state court that has

15   ruled on the a given issue.

16        **THE COURT:**  Okay.  Let's stop.

17        Do you agree that that is the federal rule that I have to

18   follow, an intermediate decision, unless there is convincing

19   evidence that the Cal Supreme Court would go otherwise?

20        **MR. BALSAM:**  Basically that's going pretty much back

21   to the Erie Doctrine.

22        **THE COURT:**  Okay.  So there is that -- their pro

23   defense case, which I've forgotten the name of.

24        **MR. NETA:**  It's called *Rosolowski*.

25        **THE COURT:**  *Rosolowski*.  And if I was writing that

1  decision, I would have come out a different way, but I'm not on

2  the State Court of Appeals and I feel obligated to follow that

3  decision.

4      **MR. BALSAM:**  The problem is that the defendants are

5  misrepresenting what *Rosolowski* actually says.

6      **THE COURT:**  Okay.  Hang on.  Now, let me hear your

7  view.  I've interrupted the defense, but let's hear your view

8  because I think that that is the heart of this case, is

9  *Rosolowski*.

10      **MR. BALSAM:**  Well, it's actually not.  In no small

11 part because of the fact that the defendants did not even know

12 which emails were at issue when they filed this MSJ.  Nothing

13 that Mr. Neta says today or in the reply changes the fact that

14 some of the spams that they omitted from the MSJ, which Wagner

15 referenced in the opposition, do not identify the advertiser,

16 do not provide an address and do not provide unsubscribe links.

17 And Wagner has put all of these emails at issue in his

18 opposition.

19      Secondly, as far as the hyperlinks *Rosolowski* did not say

20 that a hyperlink in a spam is sufficient to make the spam

21 truthful.  What the Court said twice, verbatim, is that the

22 spam is compliant if the identity of the sender -- and the

23 Court probably meant the advertiser, but that's a whole

24 separate issue.  If the identity of the sender is readily

25 ascertainable from the body.  That quote, that sentence

1    appeared twice in *Rosolowski*.

2                 **THE COURT:**  Say it -- say it again?

3                 **MR. BALSAM:**  Sure.  The sentence, if you have my --

4                 **THE COURT:**  Read it to me so that I can -- because

5    you told me it said hyperlink alone is not enough.

6                 **MR. BALSAM:**  No.  Let me back up.

7        The actual line from *Rosolowski* is...  Sorry give me one

8    second...

9                 **MR. NETA:**  If I may, your Honor.

10               **THE COURT:**  Yes, you may, because you're ready to go

11   and counsel has lost his way.

12               **MR. NETA:**  Your Honor, the Court of Appeals said that

13   they would look at multiple factors.  They are trying to figure

14   out if there are sufficient identifiers within the email to

15   determine where the email came from.  Now, they have a list --

16               **THE COURT:**  He said hyperlink alone is not enough.

17   Did the decision say that?

18               **MR. NETA:**  Absolutely not.  Your Honor, it's -- it

19   gave a list of examples in that particular case upon which the

20   Court felt that there was sufficient identifiers, including, as

21   I said, hyperlinks, unsubscribe notices and addresses.  We have

22   those in this case.  That's an absolute misrepresentation that

23   that's not true with respect to these emails.

24       But even beyond that --

25               **THE COURT:**  Do you have what you --

1           MR. BALSAM:  Yes.

2           THE COURT:  Let's hear what you were relying on.

3           MR. BALSAM:  The quote from *Rosolowski* which appears

4   twice verbatim says this:

5           "We hold a header line in a commercial email

6       advertisement does not misrepresent the identity of

7       the sender merely because it does not identify the

8       official name of the entity which sent the email or

9       merely because it does not identify an identity whose

10      domain name is traceable from an on-line database" --

11      this is the important part -- "provided the sender's

12      identity is readily ascertainable from the body of

13      the email."

14      As was the case here.  That's the paragraph that appears

15  twice.

16          THE COURT:  So why wouldn't a hyperlink in the body

17  of the email be good enough?

18          MR. BALSAM:  When you're looking at an email in your

19  browser, you see graphics, text, and most of these -- half of

20  these emails do not readily identify the sender or the

21  advertiser in the body.  They just don't.  *Rosolowski* never

22  said that a hyperlink is sufficient.

23      And if you think about it, by definition, every spam has a

24  hyperlink.  The advertiser wants you to click -- there has to

25  be a link that takes you to the advertiser's website.

1   Otherwise, the whole endeavor was pointless.

2        So we're almost in a situation where the exception

3   swallows the rule.  If the hyperlink were sufficient to avoid

4   liability, no spam would ever violate the statute because every

5   spam has a link.

6        The point of *Rosolowski*, which appears verbatim twice, is

7   that the sender has to be readily identifiable in the body.  It

8   doesn't say anything about hyperlinks.

9        The only place where the hyperlink reference appears in

10  *Rosolowski* is a reference commenting that the emails have a

11  hyperlink to Guthy's website.  And that's true, but that is not

12  why the Court said the emails are compliant.  That was a mere

13  observation, that the emails contained a link.

14            **MR. NETA:**  Your Honor, Mr. Balsam --

15            **THE COURT:**  Wait, wait, wait.  Hold on.

16            **MR. NETA:**  Yes, sir.

17            **THE COURT:**  So your point is *Rosolowski* never says

18  hyperlink alone is enough.

19            **MR. BALSAM:**  My point is that *Rosolowski* says that

20  the sender has to be readily identifiable in the body.  It

21  doesn't address hyperlinks at all in terms of compliance.

22            **THE COURT:**  All right.  What do you say?

23            **MR. NETA:**  That's completely not true, your Honor.

24  Your Honor, the Court -- in *Rosolowski* the intermediate Court

25  of Appeal determined that an email does not violate the law if

1    it contains sufficient identifiers.  It didn't say specifically

2    what was sufficient, but it said in this case there are a host

3    of reasons why these emails don't violate the law.

4        There are hyperlinks, unsubscribe notices and addresses

5    for the sender.  Each of these emails also have those things.

6    And to the extent they do -- or some emails have less or more.

7    The question is whether or not there are sufficient

8    identifiers.

9        If you look at any of these emails -- I urge -- I urge,

10   you know, Mr. Balsam to identify a single email that he claims

11   does not have one, at least one of these identifiers sufficient

12   to --

13            THE COURT:  Are you saying there's more than a

14   hyperlink?

15            MR. NETA:  Yes.  Probably a hyperlink is not enough,

16   but *Rosolowski* did not say that.  *Rosolowski* said:  We look at

17   the email holistically and we determine, based on the number of

18   identifiers there, whether or not there was a real intent to

19   deceive.

20            MR. BALSAM:  It's simply not what *Rosolowski* said.

21   The word "holistic" is not there.

22       The paragraph that appears twice says, "The sender has to

23   be readily identifiable in the body," period.  There is simply

24   nothing about hyperlinks in that key sentence that appears

25   twice.

 1          THE COURT:  Readily identifiable in the -- must be --

 2  sender I.D. must be readily identifiable --

 3          MR. BALSAM:  Actually, "readily ascertainable."

 4          THE COURT:  "Ascertainable."

 5          MR. BALSAM:  From the body.

 6          THE COURT:  From the body.

 7      And did that decision reference hyperlinks?

 8          MR. BALSAM:  The only place where the *Rosolowski*

 9  decision references hyperlinks is an observation.  It's not

10  part of the ruling.  It's an observation that the emails

11  contained links to Guthy's website.

12          THE COURT:  So what were the factors that caused that

13  Court to say those emails weren't compliant?

14          MR. BALSAM:  Oh, well.  In the *Rosolowski* case, the

15  emails from names were Proactiv and Wen Hair Care and

16  variations, Proactiv Special Offer, whatever.  The "from" names

17  all included Proactiv or Wen Hair Care.

18      These are fanciful terms.  They are registered trademarks.

19  They are well-known brands.  TV advertising.  They have their

20  own websites.

21      The plaintiff's argument was that Proactiv and Wen Hair

22  Care are not companies and, therefore, the "from" names are

23  misrepresenting who they are from.

24      As, obviously, a pro-plaintiff attorney, I think the

25  plaintiffs should have because Proactiv and Wen Hair Care are

1   brands, well-known brands.  They do identify who the emails are

2   from.

3          **THE COURT:**  Well, here is what part of it said.  It

4   said -- all of what you say seems to be true, but the decision

5   went on to conclude that, quote:

6        "Because the emails provided a hyperlink to the

7        sender's website and provided an unsubscribe notice,

8        as well as a physical address, plaintiffs cannot

9        plausibly allege that Guthy attempted to conceal its

10       identity."

11         **MR. NETA:**  That's correct, your Honor.  That's on

12  Page 1416.

13         **THE COURT:**  All right.  So what do you say to that?

14         **MR. BALSAM:**  Well, that's the part I was just looking

15  at.  There is a reference to the fact that the emails contain a

16  link.  Of course, the emails contain a link.

17      As I said before, if the emails did not contain a link,

18  the person would never -- the recipient would never be able to

19  click and go anywhere and spend any money.

20      The Court is observing that they contain a link and that's

21  true, but the key ruling, which appears right below that, is

22  that -- is that the sender has to be readily ascertainable from

23  the body.  And here in many of the spams, not all of them --

24         **THE COURT:**  I need to -- there is a dot dot dot here,

25  and I need to have -- can somebody hand up to me the decision,

this Page 1416?

**MR. BALSAM:** May I approach?

**THE COURT:** Give it to the clerk, please.

**MR. BALSAM:** The part I just put the blue line next to, the hyperlink line appears at the top of that and then at the bottom of that blue as the key ruling.

(Whereupon document was tendered to Court.)

**THE COURT:** I can't tell. Which side of the page --

**MR. BALSAM:** I'm sorry. Right column.

**THE COURT:** Right or left?

**MR. BALSAM:** The right column, near the top of the blue is where the word "hyperlink" appears.

**THE COURT:** All right. Just a moment.

"Guided by the above" -- I'm quoting now:

"Guided by the above, we turn to the facts of the instant case. Although the identity of the sender of the subject emails in the 'from' line could not be ascertained through the use of publicly available databases such as WHOIS, the body of the emails was sufficient to enable the recipient to identify Guthy as the sender. The emails were advertisements for Guthy's various consumer brands. The emails provided a hyperlink to the Guthy website and provided an unsubscribe notice as well as a physical address in Palm Desert, California. Plaintiffs cannot plausibly

1          allege that Guthy attempted to conceal its identity,

2          as the clear purpose of the emails was to drive

3          traffic to Guthy's website.  The complaint concedes

4          as much in that it alleged that if a recipient clicks

5          in the email's body, a link takes them to the website

6          where he is encouraged to make a purchase."

7      Then it goes on saying:

8          "Given Section 17529.5," et cetera, "a common

9          sense reading, we conclude a header line does not

10         misrepresent the identity of the sender merely

11         because it does not identify the official name of the

12         entity which sent the email or merely because it does

13         not identify an entity whose domain name is traceable

14         via a database such as WHOIS, provided" -- this is in

15         italics, "provided the sender's identity is readily

16         ascertainable from the body of the email as was the

17         case here."

18     Now, the way I read that is that the decision looks like

19 they relied upon three things:  The hyperlink, the unsubscribe

20 notice, as well as a physical address in Palm Desert.

21     So at least one of those three things was the hyperlink

22 that would take you to the website.

23         **MR. BALSAM:**  But, your Honor, that key sentence, the

24 second paragraph within that blue circle, that does not refer

25 to hyperlinks.

 1          THE COURT:  What sentence?

 2          MR. BALSAM:  What I have been referring to as the key

 3   ruling, "We, therefore, conclude."  That sentence says that the

 4   sender has to be readily ascertainable in the body.

 5       If the Court wanted to make the hyperlink part of the

 6   ruling, they had every opportunity to do so.  It didn't.  It

 7   put in italics.  It's emphasizing exactly what is necessary,

 8   and that says, "provided the sender's identity is readily

 9   ascertainable in the body."

10       Yes, the hyperlink does click to --

11          THE COURT:  I don't know about that.  Look -- listen,

12   I see what you're saying.  I'm going to read that again.

13       It says:

14          "Provided the sender's identity is readily

15          ascertainable from the body of the email," as was the

16          case here.

17       And then just above that where they say -- they say:

18          "The body of the email" -- talking about that

19          case -- "was sufficient to enable the recipient to

20          identify Guthy as the sender."

21       Then it goes on to give several reasons, one of which is

22   the hyperlink.

23       So how can you say that the hyperlink was not something

24   that the Court of Appeals relied on?

25          MR. BALSAM:  The Court is referencing the hyperlink

```
 1  because the spams did contain hyperlinks going to Guthy.  Of
 2  course, they did.  These are ads for Guthy.  If the links don't
 3  go to Guthy, it's pointless.
 4      The Court is observing that the links go there.  And
 5  that's true.  That's not in dispute.  But that key ruling does
 6  not refer to -- I mean, we have to follow the lower courts and
 7  the lower court did not say that the hyperlink in the body is
 8  sufficient.  It could have --
 9          THE COURT:  It did not say that.  It did not say
10  that.  You're right.  But it did rely, in part, on the
11  hyperlink.
12          MR. BALSAM:  The -- yes.  I mean, the hyperlink did
13  go to Guthy, but it's not in the ruling.
14      Moreover, the ruling refers to the sender.  It doesn't
15  refer to the advertiser.  It refers to the sender.  And in most
16  of these spams, the sender's identity is not there at all.
17          THE COURT:  What do you mean -- when you say "these
18  emails," you mean the ones in our case?
19          MR. BALSAM:  Yes, yes.
20          THE COURT:  What do you mean by that?  That's a
21  different point all together.
22          MR. BALSAM:  Well, under California law, senders and
23  advertisers are different parties.  Well, it can be the same,
24  but often it's different.
25      The way that email marketing works is that you have
```

1  advertisers that hire third parties to hit the "send" button

2  for them.

3          **MR. NETA:**  Sometimes, but not always.

4          **MR. BALSAM:**  In some of these emails the Spire Vision

5  family sent them themselves, and in some they hired third

6  parties to send for them.  Those are the bunch that were

7  conveniently left out of the MSJ all together, the ones sent by

8  third parties.

9          **THE COURT:**  Wait a minute.  So give me an example of

10  one sent by a third party.

11          **MR. BALSAM:**  Sure.  Wagner number -- if you look at

12  table one.

13          **MR. NETA:**  Can you give the Bates number stamp?

14          **THE COURT:**  I can't find all that paperwork.  Just

15  verbalize it for me.

16          **MR. BALSAM:**  Okay.  What I refer to as Wagner spam

17  No. 25.  It's the subject line says, "Help Americans With a

18  Crisis Counseling Education."  Okay.  Subject line is fine.

19      "From" name "Crisis Counseling USA."

20      The body has text and random links, including "network" --

21  "networkworkers.com."

22      At the bottom it says, "DPC 1357 Broadway, No. 533, New

23  York 10018."

24      There is no opt out links in here.

25      So DPC, even assuming that a random consumer is supposed

1  to know that DPC means Digital Publishing Corporation.  That's

2  the advertiser.  It's not the sender.  And we know it's not the

3  sender because the sending domain name is cmaile.com, which is

4  registered to something in Australia.  The defendants don't

5  even claim that they own cmaile.com.

6          **THE COURT:**  This is the one at the top that, "Earn a

7  Social Work Degree"?

8          **MR. BALSAM:**  No, but there's a bunch that are

9  similar.

10          **THE COURT:**  My law clerk gave me the wrong one.  I'm

11 going to hand this down to you and you hand me the one that

12 you're talking about.

13          **MR. BALSAM:**  I was looking at No. 25.

14          **THE COURT:**  I don't know how to tell which one is 25.

15          **MR. BALSAM:**  I believe it's tabbed A-25.

16          **THE COURT:**  You didn't given me tabs -- I'm sorry.

17 You did give me tabs.

18     Is this the one that says Wagner 315 at the bottom?

19          **MR. NETA:**  It says Wagner 309 at the bottom, is the

20 first page of this email, your Honor.

21          **THE COURT:**  Well, here.  My set is goofed up.  I

22 turned to A-25 but it doesn't have 309.

23          **MR. BALSAM:**  That's because it's not 309, it's 315.

24          **MR. NETA:**  315.  You were reading from a different

25 email then.

 1         MR. BALSAM:  No, I wasn't.

 2         THE COURT:  Well, this is -- so, 315 --

 3         MR. BALSAM:  Sorry, I was.  Okay.  A-25, Bates No.

 4    315.  Subject line starts, "Social Worker Education" from

 5    "Social Worker Courses," which does not identify who it's from.

 6    Body says, "Earn a social work degree."  There's some random

 7    text.  Safari landing page dot org.  I have no idea what that

 8    means.

 9        Go down to the bottom, there is no opt out link.  It says:

10    "Publishing Corp.", which is not any of the defendants.  At

11    best, it's Digital Publishing Corp.  "Publishing Corp." does

12    not identify who the advertiser is and there is no reference

13    whatsoever to who the sender is.

14         THE COURT:  What do you say to that one?  How does --

15    how can you figure out who the sender's identity is?

16         MR. NETA:  If you look at this email, your Honor, it

17    says, "Start your social work education."  That's the subject

18    line.  It has a "from" line that says "Social Worker Courses."

19    There is a mailing address in the body of the email.  There is

20    an "opt out" and "remove me" link.

21         MR. BALSAM:  There is not an opt out" link.

22         MR. NETA:  If you look at the following page it says

23    "remove me."

24        The problem is, your Honor --

25         THE COURT:  Wait a minute.  Wait a minute.

```
 1              MR. BALSAM:  That's not a link.

 2              THE COURT:  Just a minute.  It says "remove me," but

 3   I don't understand how --

 4              MR. NETA:  If I can explain your Honor?

 5              THE COURT:  Yes.

 6              MR. NETA:  Plaintiff's attorney did not submit the

 7   emails in a fashion that we can look at, like many of these

 8   other emails where there is actually a picture of a link.

 9       I mean, this is all produced in a format that you can't

10   perceive what the email actually looked like when it was

11   received.

12              THE COURT:  Where is your version?

13              MR. NETA:  We don't have a version other than the

14   version that they produced and this is all they produced to us.

15              MR. BALSAM:  Your Honor, that's not true.  This is

16   exactly what appeared on Wagner's screen.

17       And Wagner is actually here.  If you would like him to

18   testify that this is what appeared on his screen, he can do

19   that.

20              MR. NETA:  Your Honor, I will tell you there is an

21   "opt out" link.  There is a hyperlink to

22   "becomeasocialworker" -- let's see.

23       Well, not in this particular, but the landing pages were

24   designed to actually lead to these websites

25   "becomeasocialworker" dot something.
```

1    "becomeasocialworker.info."

2         So we would tell your Honor that these -- these

3    identifiers are sufficient.

4         And beyond that, if you look at the "from" name, "Social

5    Worker Courses," and in the bracket it says "fhdsh@cmaile.com."

6    That "from" line is in no way different from the "from" lines

7    that the Ninth Circuit found were preempted by CAN-SPAM.

8         If you look at the email addresses from which -- the

9    addresses from which emails were sent in the *Gorman versus*

10   *Virtumundo* case, the same thing.  They said "Criminal Justice."

11   And in brackets "criminaljusticeactvmail.com."  It didn't

12   identify the sender there.

13        So what they said in that case was there is no proof that

14   the "from" lines had been altered to impair the identification

15   of anybody.  So the claims weren't based in --

16             **THE COURT:**  How can you tell?  It says "Social Worker

17   Courses" and then there is an email address.  That doesn't tell

18   me readily available.  It doesn't tell me who the sender is.

19        Why do you say that that's good enough?

20             **MR. NETA:**  That in and of itself is not good enough,

21   your Honor.

22        According to *Rosolowski*, you have to look at all these

23   identifiers within the body of the email.  They said a

24   hyperlink, an unsubscribe notice and an address.

25             **THE COURT:**  Looking at this one, to me it's Greek.  I

1  couldn't tell a thing from it.

2        **MR. NETA:**  And I appreciate that, your Honor.   In

3  which case I would submit to you that if you look at the "from"

4  line, "Social Workers Courses, fhdsh@cmaile.com," that is no

5  way different from the "from" lines claims about which were

6  preempted in *Gordon versus Virtumundo*.  That is the exact --

7        **THE COURT:**  I thought we were talking about

8  *Rosolowski*.

9        **MR. BALSAM:**  Your Honor, Mr. Neta is also

10  misrepresenting *Gordon*.  The *Gordon* case was about domain

11  names.  We're talking about "from" names.

12     Our contention is that "Social Worker Courses" as a "from"

13  name, quoted "from" name, is misrepresenting who it's from.

14        **THE COURT:**  These aren't even underlined.  Are

15  these -- when they appeared on the screen, did they have the

16  little line underneath it so that you would click on it?

17        **MR. BALSAM:**  No.

18        **THE COURT:**  Well, where is the one that you would

19  click on to go to the website?  You said that there was always

20  such a thing, but I don't see any hyperlink here.

21        **MR. NETA:**  If you will look at these links here, your

22  Honor, they display -- I would submit that they displayed

23  differently Safari landing page dot org.  Those are links to

24  websites, the advertiser's website where you could readily see

25  an advertiser branded website.

1          **MR. BALSAM:**  Those are malformed links.  They are not

2  actually clickable.

3      What Wagner had to do -- and he can testify to this, if

4  you'd like -- he had to copy this text, parts of this text,

5  paste it into a browser to see where it went.  These are not

6  clickable.

7          **THE COURT:**  You said earlier, as day follows night,

8  that every single one of these things always had a hyperlink.

9          **MR. BALSAM:**  No, no --

10          **THE COURT:**  That's what you said.

11          **MR. NETA:**  Yeah.

12          **MR. BALSAM:**  I -- they contain -- at best, they have

13  malformed hyperlinks.  I'll clarify the previous --

14          **THE COURT:**  Well, what good would it do a fraudster

15  to have something where you have got to copy down that

16  complicated language?  Nobody is going to do it.

17          **MR. BALSAM:**  It's a sloppy spammer.

18          **THE COURT:**  Uhh.

19          **MR. BALSAM:**  Regardless, there's nothing in here.  At

20  best, it identifies the advertiser.  It does not identify the

21  sender.

22          **MR. NETA:**  The sender, your Honor, is Publishing

23  Corp.  I believe it was cut off.  It's Digital Publishing Corp.

24  and if you check that address --

25          **MR. BALSAM:**  No, it's --

1          **MR. NETA:**  Digital -- excuse me.  It's the same

2   address for Digital Publishing Corp.

3          **THE COURT:**  Don't you -- on the defense side, don't

4   you have your own versions of what records to show what was

5   sent?

6          **MR. NETA:**  Not always, your Honor.  Especially in the

7   instance where Mr. Balsam described our clients had emails sent

8   on their behalf and they don't have copies of those emails.

9          **THE COURT:**  Well, then if he -- I don't know if he

10  has yet, the time to stand and deliver was before today.

11         Is there something in here where he has said under oath

12  this is the way it showed up?  I guess he does.  I guess he's

13  got some -- so let's see what he said No. 25 was.

14         "A-25, not included in defendant's MSJ, is a true

15         and correct copy of a spam I received, including full

16         headers, source code and click-through redirect

17         links.  This spam was sent by one of SBF's

18         third-party marketing agents using the domain name

19         cmaile.com and advertising defendant's website

20         "becomeasocialworker.info.  I refer to this spam as

21         spam No. 25."

22         It says true and correct copy.

23         **MR. NETA:**  There are a couple of different types of

24  copies, your Honor.  It could be a native copy for an ASCII

25  text.

```
 1        I mean, Mr. Wagner here, as far as I can tell, doesn't
 2   insist that this email as he produced it is displayed exactly
 3   as it was received in his in box.
 4            THE COURT:  I would be so upset if it turns out that
 5   No. 25 is not exactly the way it appeared on the screen.  And
 6   if it turned out there was a hyperlink in there, meaning you
 7   could click on it, you would be in a lot of trouble because you
 8   told me this is exactly the way it appeared on the screen.
 9        Now I'm going to give you a chance to fix it now.  I don't
10   want to have more testimony right now.  I want to know the
11   truth.  Was there a hyperlink or not?
12            MR. BALSAM:  No.  At best, it's a malformed
13   hyperlink.
14            THE COURT:  It's what?
15            MR. BALSAM:  At best it is a malformed hyperlink
16   that's not clickable.
17            THE COURT:  I don't know what to do with this mess.
18   You should have had records.  Doesn't the company that you
19   hired keep records?
20            MR. NETA:  Not always, your Honor.  There are a lot
21   of --
22            THE COURT:  Whose problem is that then?  If they
23   don't keep records, then I've got to go with what the plaintiff
24   has.
25            MR. NETA:  Well, we have strict guidelines in place
```

1  with respect to the third parties that we work with.  We insist

2  that they follow these guidelines and sometimes they don't.

3  They don't keep records and they don't follow those guidelines.

4        THE COURT:  Who put that train in motion?  You did.

5  Your side.

6        MR. NETA:  I agree, your Honor.  Which is why as we

7  say in our opening motion, there are two issues at stake in

8  that case:  Not only *Rosolowski*, but also Gordon.

9        And in Gordon they say there must be a material

10  misrepresentation.  That's what you said the last time we were

11  before you on a motion for summary judgment.  And given

12  these --

13        THE COURT:  Who the sender is is material.

14        MR. NETA:  Well, only if there was a real intent to,

15  you know, alter or impair the identification.  That's not what

16  they found in *Gordon*.

17        And the "from" lines in Gordon are no different than the

18  ones we have in this case, your Honor.

19        MR. BALSAM:  That's not true.

20        THE COURT:  All right.  I'm going to give each of you

21  a moment to say anything else you would like and then I've got

22  to go to the next case.  So defendant gets to go first.

23        MR. NETA:  Thank you, your Honor.

24        We claim that all of these emails are -- do not violate

25  the California state law because of *Rosolowski*.  But even to

1  the extent you find an email that does, we believe that *Gordon*

2  applies.

3      The "from" names in that case, *Gordon* claimed that the

4  emails were deceptive because they didn't identify the sender,

5  but there was no proof that any of the headers were altered for

6  the specific purpose of impairing the identification.

7      So the claims are not based in torts.  And so the claims

8  are preempted.

9      We haven't talked about subject lines, but I'll tell you,

10  your Honor, that all the subject lines of which plaintiff

11  complains indicate that a survey must be completed.  That's an

12  accurate description of the offer, so there is no -- there's no

13  way that any of these emails are materially misleading.

14      The emails contain links identifying the advertiser.  They

15  clearly inform the recipient that the emails are ads, just like

16  the emails in *Gordon*.  They contain an express reference to a

17  product in the header, just like the emails in Gordon.  So

18  there's no argument, I think, that the claims aren't

19  preemptive.

20      We also haven't talked about practices and procedures,

21  your Honor, but I'll tell you that, as I said and as indicated

22  in our briefing, we have strict procedures, strong penalties

23  and we review our procedures on an ongoing basis to make sure

24  that they are complied with.

25          **THE COURT:**  Your turn.

1              **MR. BALSAM:**  *Gordon* is about domain names.  It's not

2     about "from" names.  The line that -- Mr. Neta referenced

3     torts, which makes no sense.  We are alleging torts as opposed

4     to violations of contracts.  We're talking about violations of

5     statutes, that's torts.

6          The subject lines do say that a person can get a gift card

7     when they complete a survey, but there is not even the

8     slightest hint of purchase requirements.

9          Some of the bodies reference completing sponsor offers,

10    but some don't.  Mr. Neta confuses or tries to collapse a two

11    violations with a three violations.  A three is when a subject

12    line is misleading relative to the body.  A two violations are

13    when a subject line is absolutely false.  And I provided an

14    example in the papers.

15         If the subject line in the body both say two plus two

16    equals five, well, that's not an A3 violation.  Subject line is

17    clear relative to the body.  But two plus two equals five is

18    absolutely false, and that's what we're talking about here.

19         The emails do not all contain links.  They do not all

20    identify the advertiser or the sender.  And they do not all

21    contain unsubscribe links.

22         As far as practice and procedures, Mr. Neta just admitted

23    that the affiliates don't always do what they are supposed to.

24    Even if there are practices and procedures, they are obviously

25    not effective, and that's part of the requirement to get the

1  reduction in statutory damages.

2      Their current general counsel made the statements -- the

3  original declaration was written in the present tense.  He has

4  no foundation for what happened at Spire Vision before he got

5  there.

6      The supplemental declaration, at best, says that he

7  reviewed paper, but that doesn't mean he really knows what

8  happened.  Moreover, that second declaration does not sign

9  under penalty of perjury, so it means nothing.

10      Finally, I just want to talk about the existence or

11  possible existence of the series LLCs for a moment.  We haven't

12  talked about that today.  There is a true question of material

13  fact whether these series LLCs exist and if they exist, when

14  they were created.

15      Every bit of evidence, including the former general

16  counsel's testimony, says that these entities did not exist in

17  2011 and '12.

18      When Gary Li signed these creation papers, at the time he

19  signed them, supposedly signed them, his title was Server

20  Operations Assistant.  He signed them with a director title.

21  By Gary Li's own admission on his LinkedIn profile he didn't

22  become a director of anything until May of 2013.

23      Wagner contends that these documents are fraudulently

24  backdated to show -- to make it look at though these entities

25  were created in 2011 and 2012 when they weren't.

1          There's enough issues of material fact that this Court

2   cannot, should not grant the MSJ.

3              **THE COURT:**  All right.  Thank you, counsel.

4          **MR. NETA:**  Thank you, your Honor.

5          **MR. BALSAM:**  Thank you, your Honor.

6              (Proceedings adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Debra L. Pas*

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, February 26, 2015